**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

May 16 2014, 9:08 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**THOMAS C. ALLEN**
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
Deputy Attorney General
Indianapolis, Indiana

**CHRISTINE REDELMAN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE TERMINATION OF )
THE PARENT-CHILD RELATIONSHIP OF: )
C.M., J.J., L.S., and A.S., Minor Children, )
                                         )

M.H., Mother, )
                                         )

        Appellant-Respondent, )

                     vs. )       No. 02A03-1309-JT-371

INDIANA DEPARTMENT OF CHILD )
SERVICES, )
                                         )

        Appellee-Petitioner. )

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable Charles F. Pratt, Judge
Cause Nos. 02D08-1211-JT-139, 02D08-1211-JT-140,
02D08-1211-JT-141, 02D08-1211-JT-142

**May 16, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

M.H. ("Mother") appeals the involuntary termination of her parental rights to her children, C.M., J.J., L.S., and A.S. (collectively, the "Children"). Mother raises one issue which we revise and restate as whether the evidence is sufficient to support the trial court's judgment terminating her parental rights. We affirm.

FACTS AND PROCEDURAL HISTORY

Mother is the biological mother of C.M., born on June 22, 2001, J.J., born on May 23, 2007, L.S., born on June 14, 2009, and A.S., born on October 8, 2010.[1] In 2008 or 2009, J.J. and C.M. were found to be children in need of services ("CHINS"). In 2009, J.J., C.M., and L.S. were determined to be CHINS.

In April 2011, Mother had an overnight stay at Parkview Behavioral Health. On July 14, 2011, Mother and G.S., the father of L.S. and A.S., went to the Three Rivers festival where Mother and G.S. consumed alcohol and then engaged in a domestic violence altercation at Mother's residence while the Children were present.

On July 18, 2011, the Allen County Department of Child Services filed a petition alleging that the Children were CHINS in four separate cause numbers. On July 21, 2011, the court entered a Preliminary Inquiry Order under the four cause numbers which ordered an immediate initial hearing. That same day, the court ordered that the Children be placed in licensed foster care, required Mother to perform certain items, and ordered Mother to have supervised visitation with the Children.

---

[1] The fathers of the Children have consented to the adoption of their children.

2

At some point, C.M. and J.J. were placed in the homes of their respective paternal grandparents. L.S. and A.S. were placed in licensed foster care. On August 24, 2011, Mother admitted certain allegations in the amended petition alleging the Children to be CHINS. Specifically, Mother admitted that C.M. and J.J. were determined to be CHINS on April 16, 2008, that C.M., J.J., and L.S. were determined to be CHINS on August 5, 2009, that Mother was unemployed prior to the writing of the Preliminary Inquiry Report, that Mother had one overnight stay at Parkview Behavioral Health between April 10, 2011, and April 11, 2011, that on July 14, 2011, after going to the Three Rivers festival where Mother and G.S had both consumed alcohol, Mother and G.S. engaged in a domestic violence altercation at Mother's residence while her children were present in the home. That same day, the court entered an Order on Dispositional Hearing which included a parent participation plan. In part, the court ordered Mother to obtain a drug and alcohol assessment at Caring About People ("CAP"), Inc., by September 24, 2011, and follow all recommendations of the assessment.

In January 2012, the court entered a Permanency Plan Order which found that there was some question as to whether Mother had benefitted from the services provided. In July 2012, the court entered an order finding that J.J. was returned to Mother's care on May 7, 2012, that Mother's participation in therapy has noticeably declined since J.J.'s return to her care, that Mother had been belligerent and irrational with family members and the case manager, and that there had also been problems with Mother's abuse of alcohol since J.J.'s return to her home. The court also found that placement of J.J. with Mother was not safe for J.J. or in his best interest and that Mother's history did not

support the conclusion that additional home based services would improve the situation. In September 2012, the court entered a Permanency Plan Order finding again that Mother had not demonstrated an ability to benefit from services.

In October 2012, Mother was convicted of operating a vehicle while intoxicated and resisting law enforcement. The court sentenced Mother to a suspended sentence and placed her on probation. The court required Mother to complete drug and alcohol classes as part of her probation.

On December 10, 2012, the Indiana Department of Child Services ("DCS") filed a petition for termination of Mother's parental rights to the Children.[2] In March 2013, Mother admitted a probation violation and admitted that she had consumed alcohol in violation of her probation.

On April 8, May 13, and May 20, 2013, the court held a hearing on the termination petition. Lisa Bartelheim, a clinician and home based case service coordinator with CAP, testified regarding Mother's involvement with CAP. Specifically, she testified that she met with Mother in May 2012, that Mother did not complete the required amount of individual substance abuse sessions, that she did not complete her drug and alcohol classes at CAP, and that her case was closed out in October 2012 due to a lack of attendance. After a reassessment, CAP imposed a zero tolerance policy and communicated this to Mother. Mother missed appointments, and the case was closed out in December 2012. Gilda Howard, a substance abuse therapist at CAP, testified that

---

[2] The record does not contain a copy of the petition.

4

Mother attended a group session and was "real rude and disrespectful," and Howard asked her to leave the group. Transcript at 115.

Denzie Taylor, a therapist, testified that he supervised Mother's visits with the Children beginning in August 2012, and that there was a gap between January 23, 2013, and February 19, 2013, in the visitations because Mother stopped services. Taylor also testified that he was asked to supervise visits because there was some conversation between Mother and C.M. that was causing distress to C.M. Taylor testified that Mother was not ready for unsupervised visits because of Mother's lack of attention and lack of focus and Mother's conversations with the older boys were distressing to them. Taylor also testified that Mother's discussions with the older boys were inappropriate and involved Mother complaining about the grandmothers.

Dr. David Lombard, a clinical psychologist, testified that he evaluated Mother on September 27, 2011, and diagnosed her with a generalized anxiety disorder and a borderline personality disorder. Dr. Lombard recommended dialectical behavioral therapy ("DBT") for Mother's borderline personality disorder. Dr. Lombard evaluated Mother again on March 27, 2012, and the diagnosis was the same, but Mother had shown some improvement. Dr. Lombard also testified that the testing still showed some invalid responses which limited his ability to gauge meaningful progress. When asked his response if informed that Mother had not finished her DBT program, Dr. Lombard testified that borderline personality disorder is not a condition that "just gets better on its own" and that it can be difficult to parent effectively and healthily while having that condition. Id. at 176.

Molly Hall, the family case manager, testified that Mother was extremely confrontational at times to the point where Hall ended phone conversations. Hall described voicemails from Mother that she received between July 2012 and February 2013 as a "very significant problem." Id. at 192. Specifically, Hall testified that Mother would leave seventeen to twenty-two messages in a twenty-four or forty-eight hour period and that the messages would become incoherent at times and Mother's speech was slurred. Hall testified that after Mother's failure to complete the program at CAP, Hall referred Mother to Headwaters Counseling on January 9, 2013, at Mother's request, but that referral was closed for lack of contact for forty-five days. Mother then requested a referral to the Transitions Residential Program, and Mother began that program but left a week later. Mother then requested a referral to Hope House, where Mother was participating at the time of the hearing, but Hope House did not allow children at the facility and Mother would not complete the program until September 2013. Hall also testified that Mother had not yet completed the DBT program and that Mother's attendance has been inconsistent.

On August 16, 2013, the court entered four orders under different cause numbers terminating Mother's parental rights to each of her four Children. The order relating to L.S. contained the following:

15.   [Mother] admits that she has been involved in difficult relationships. From her testimony the Court finds she and the fathers of the children have a history of domestic violence and drug or alcohol abuse.

16.   [Mother] has completed two (2) psychological evaluations with psychologist Dr. David Lombard. The first evaluation was completed in September 2011 and the second was completed in

6

March 2012. From the testimony of Dr. Lombard the court finds that [Mother] carries a diagnosis of general anxiety disorder and borderline personality disorder. She was referred to cognitive behavioral therapy and medication for her anxiety. She was referred to Dialectical Behavioral Therapy (DBT) for her personality disorder diagnosis. Dr. Lombard testified and the Court finds that a parent with borderline personality disorder may experience emotional volatility, mood inconsistencies, and depression issues that could adversely impact a child's emotional development. DBT may help a patient resolve those issues though [sic] a program of group and individual therapy maintained over a period of six (6) months or more.

17. The Mother testified that the Department provided her with a referral for Dialectical Behavioral Therapy in September 2011 and she acknowledged that she has not yet completed the therapy program. From the testimony of Department Casemanager Molly Hall the Court finds that, as of May 13, 2013, [Mother] has participated in two rounds of group therapy but has not completed the individual therapy portion of the program. Casemanager Hall outlined in her testimony a pattern of the Mother's inconsistent attendance and the Court finds that she has only attended 55% of her appointments.

18. Through his second clinical interview with the Mother in March 2012, Dr. Lombard observed some improved [sic] in her anxiety symptoms. However, his observed improvements were not similarly evidenced in her test results.

19. From the testimony of Lisa Ba[r]telheim, a clinician and home based coordinator with CAP, Inc., the Court finds that the Mother was referred to that agency for substance abuse treatment. The case was closed following the first referral owing to the [Mother's] absenteeism. A second referral was made and she was placed on a treatment track that required seventy-two (72) hours of treatment and education. It also included what was characterized as relapse prevention. Owing to a "zero tolerance" attendance policy, the referral was closed because [Mother] missed a session. Clinician Ba[r]telheim opined that the Mother needed intensive therapy.

20. In January 28, 2013, Mother was referred for a residential treatment program through Transitions, a local residential program for women. After one week, the Mother left the program stating that she had been threatened by another woman and that she feared for her safety.

21. In October 2012, the Mother was arrested and convicted of operating while intoxicated. The Mother was ordered to complete drug and alcohol treatment through the Allen County's Alcohol Countermeasures program. She did not complete that program and was ordered to enroll in therapy through another agency beginning in April 13, 2013.

22. In March, 2013, the Mother requested a referral for her enrollment in the Hope House, a residential program for addicted women. Unlike Transactions, the policy of the Hope House precludes the children from being placed with her during her stay. The Mother admitted in Court that she is an alcoholic and participates regularly in Alcoholic Anonymous 12 Step Program at the Hope House and has obtained a sponsor. At the close of evidence her participating in the Hope House was continuing.

23. From testimony of Amanda Holcomb of the Hope House, the Court finds that the Mother was admitted in March 2013 and must complete three levels after her probationary period in order to be successfully discharged. As of May 20, 2013, the Mother had not had any positive tests for alcohol or other drugs since her admission. The Mother has completed seventy-six (76) days in her probationary period and Ms. Holcomb believes that the Mother will advance to the first level soon. She estimates that the program will take the Mother eight months to complete.

24. Between July 2011 and December 2011 the Mother remained unemployed. In December 2011 she secured part-time positions with McDonalds and Lil Caesars restaurants. However, by June or July 2012 she was again unemployed. She then secured a position as a waitress for a short period of time in November 2012 at a local "gentleman's club". Since her enrollment at the Hope House, the Mother has secured a job.

25. The Mother has not maintained independent housing for most of the period of the underlying CHINS case having lived most of that time with her father.

26. With the exception of a period of one or two months in the summer of 2012, the Mother's visits with the child and siblings have been supervised by agencies contracted by the Department. From the testimony of Denzie Taylor a therapist and visitation supervisor at SCAN, the Court finds that the Mother visits with the eldest children once every two weeks. She visits with the younger children every

week. Therapist Taylor has observed that the Mother avoids discipline and tolerates behavior in the children until it becomes intolerable. He has concluded that the Mother is not yet ready for unsupervised visits with the children because she lacks the ability to be attentive to all of them and demonstrates a lack of focus. He has found that her discussions with the older children to be inappropriate. The Mother is critical of the grandparents (caregivers) of the older children which causes the children to be defensive. He has observed that the level of bonding between [Mother] and the two elder children to very [sic] and expresses his opinion that her bond with the younger two children is "pretty good".

27. During a visit on or about January 19, 2013 the child's older brother expressed his anger over the receipt of text messages from the Mother that he deemed inappropriate. (The Mother admits that she was intoxicated when she sent the messages to her son.) After twenty minutes she ended the visit and refused to visit with the children between January 23 and February 19, 2013. Since then therapeutic visits were restored.

28. Between July 2012 and September 2012 the Mother left multiple voice mails over the weekends or evenings for Casemanager Hall. From her testimony the Court finds that the Mother's communications were incoherent and that her speech was slurred.

29. Over the course of her case management, Casemanager Hall has made forty-three (43) Departmental referrals to services and programs for the Mother. She has concluded that placing the child and the siblings for adoption is in the child's best interests because the Mother has not made consistent progress and the children have suffered as a result.

30. Should parental rights be terminated the Department has an appropriate plan, that being adoption.

31. The child's Guardian ad Litem has also concluded that the child's best interests are served by the termination of parental rights. In support of his conclusion he cites the Mother's inability to complete services, her history of instability and the fact that she has only recently begun DBT. He further noted that at the time evidence was closed the Mother was still not able to care for the children.

9

**BASED ON THE ABOVE FINDINGS OF FACT THE COURT APPLIES THE RELEVANT STATUTORY LAW AND CONCLUDES THAT:**

* * * * *

2.     . . . By clear and convincing evidence the court determines that there is a reasonable probability that reasons that brought about the child's placement outside the home will not be remedied. Over the course of five years and three CHINS adjudications, the Mother has demonstrated an historic pattern of conduct reflecting an inability to provide sustainable permanency of the child in her care. Multiple services have been offered to the Mother in the present underlying CHINS case and she has not yet completed any of them. Although her current involvement in the Hope House is promising, she has gone over seventy (70) days in the probationary period and had not, at the close of evidence, graduated to the first of three levels required for her successful discharge. She has demonstrated poor judgment in the communication with her children and her response to their angst has been to withdraw rather than to view the situation from the child's perspective. She has then, this court concludes, demonstrated those types of negative behaviors identified by Dr. Lombard as being exhibited by parents suffering from a personality disorder; an affliction for which she has not yet completed treatment. Not only is the Mother, after three CHINS cases and the provision of services in the most recent case, unable to accept the child into her care, the visitation therapist does not recommend that there should be unsupervised contact between [Mother] and child. The father has consented to the child's adoption.

3.     Termination must be in the child's best interests and the petitioner must have a satisfactory plan for the care and treatment of the child. [IC 31-35-2-4(b)(C) and (D) and IC 31-35-2-8].[3] In this case the Guardian ad Litem has concluded that termination of parental rights is in the child's best interests. The child needs a safe stable and nurturing home environment. The father has consented to the child's adoption and the Mother has not demonstrated an ability to provide for his care for any significant period of time. Unless the Mother successfully completes her DBT therapy (which she has not yet done) the child's emotional development may be adversely affected. If parental rights are terminated, the child may be adopted by a

---

[3] Bracketed text appears in original.

relative who has consistently provided for the child. The child's best interests are served by granting the petition to terminate the parent-child relationship. The adoption of the child is an appropriate plan.

4. The Department of Child Services has thus proven by clear and convincing evidence that the allegations of the petition are true and that the parent-child relationships should be terminated.

Appellant's Appendix at 40-43. The orders relating to the other children contained similar statements in most respects.

## DISCUSSION

The issue is whether the evidence is sufficient to support the trial court's judgment terminating Mother's parental rights. When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. In accordance with Ind. Code § 31-35-2-8(c), the trial court's judgment contains specific findings of fact and conclusions thereon. We therefore apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. Id. In deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), reh'g denied, trans. denied, cert. denied, 534 U.S. 1161, 122 S. Ct. 1197 (2002); see also Bester, 839 N.E.2d at 147. Thus, if the evidence and inferences support the trial court's decision, we must affirm. Id.

11

"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re M.B., 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. Although parental rights are of a constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. In re R.H., 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). Moreover, a trial court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. McBride v. Monroe Cnty. Office of Family & Children, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

Before parental rights may be involuntarily terminated in Indiana, the State is required to allege and prove, among other things:

(B)     that one (1) of the following is true:

> (i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii)   The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)     that termination is in the best interests of the child; and

(D)     that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" In re G.Y., 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2 (2008)), reh'g

12

denied.  "[I]f the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship."  Ind. Code § 31-35-2-8(a) (emphasis added).

Mother argues that it was in the Children's best interest to remain in a relationship with her because her current compliance with her treatment program demonstrated a high likelihood of success.  She contends that she entered the Hope House in March 2013, exhibited a positive attitude, and could complete her treatment program as early as September 2013.  Mother also argues that her treatment for alcohol abuse was also progressing well as she was involved in the Alcoholics Anonymous program and attended sessions on a daily basis.  She notes that since her placement she had not tested positive for drugs or alcohol.  Mother also argues that her regular attendance at her DBT would improve her parenting, and that she was visiting the Children to the betterment of them all and that there was no testimony that her continued involvement in visitation with the Children would be damaging to them or that it rose to such a level that visitation should be terminated.  Mother also points out that at the time of the hearing, she had begun employment at a restaurant and was working approximately twenty to thirty hours per week and that this was a good first step in becoming financially self-sufficient.

The DCS argues that Mother makes no specific challenges to the statutory elements and findings under Ind. Code § 31-35-2-4(b)(2)(B), and that Mother challenges only the court's conclusion that termination is in the Children's best interests.  The DCS also contends that although Mother does not specifically challenge the court's determination that there was a reasonable probability that she would not remedy the

situation, she does argue that she demonstrated improvement prior to the termination hearing which could be construed as a challenge to the court's finding that she was not likely to remedy the reasons for the Children being outside of her care. The DCS asserts that the court was within its discretion to weigh heavily Mother's historical negative conduct. The DCS also argues that the termination of parental rights was in the Children's best interests.

A.      Conditions Remedied / Threat to Well-Being

To the extent that Mother challenges the sufficiency of the evidence supporting the trial court's findings as to subparagraphs (b)(2)(B), we will address her arguments. Ind. Code § 31-35-2-4(b)(2)(B) is written in the disjunctive and requires the State to establish, by clear and convincing evidence, only one of the three requirements of subparagraph 4(b)(2)(B). Mother admits that C.M. and J.J. have been adjudicated CHINS on two separate occasions. Accordingly, subsection (b)(2)(B)(iii) was met with respect to C.M. and J.J. Nonetheless, with respect to L.S. and A.S., as well as C.M. and J.J., we observe that to determine whether a reasonable probability exists that the conditions justifying a child's continued placement outside the home will not be remedied, the trial court must judge a parent's fitness to care for her children at the time of the termination hearing and take into consideration evidence of changed conditions. In re J.T., 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), trans. denied. However, the trial court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." Id.

14

We also observe that a parent's character is at issue in proceedings to terminate parental rights. See Matter of D.G., 702 N.E.2d 777, 780 (Ind. Ct. App. 1998) (holding that specific instances of character, including evidence regarding a previous termination of parental rights, is admissible character evidence in a subsequent termination proceeding). Indeed, a parent's character is an integral factor in assessing a parent's fitness and in determining the child's best interest. Id. Also, this court has previously observed that in deciding whether to terminate a parent's parental rights, a court may properly consider evidence of that parent's criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. In re N.Q., 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). This is because although a court must judge a parent's fitness to care for his or her child at the time of the termination hearing and take into consideration evidence of changed conditions, it must also, due to the permanent effect of termination, evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. Id.

The record reveals that while Mother was at Hope House at the time of the hearings, Mother did not begin the program there until March 2013. Mother's participation in Hope House occurred only after her failure to complete the program at CAP, Headwaters Counseling, and Transitions Residential Program. The record reveals that clear and convincing evidence supports the trial court's findings as detailed above, and the findings provide ample evidence to support the trial court's ultimate decision to terminate Mother's parental rights to the Children.

B.      Best Interests

We next consider Mother's assertion that DCS failed to prove termination of her parental rights is in the Children's best interests.  In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the DCS and to the totality of the evidence.  McBride, 798 N.E.2d at 203.  In so doing, the court must subordinate the interests of the parent to those of the child.  Id.  The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship.  Id.  Moreover, the recommendations by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in a child's best interests.  A.D.S. v. Ind. Dep't of Child Servs., 987 N.E.2d 1150, 1158-1159 (Ind. Ct. App. 2013), trans. denied.

During direct examination, Hall, the family case manager, testified with respect to the reason why the DCS recommended termination as follows:

> The children have been removed from her care for twenty-two (22) months in this current CHINS case.  I believe there were two (2) subsequent CHINS cases beginning I think in 2008 and again in the end of 2009 I believe.  So over a four (4) to five (5) year period we've provided – we've provided substantial services through now this is the third CHINS case.  The last two (2) the children were reunified and then there was another CHINS case after that.  And then in this case there's been no substantial consistent progress.  We attempted to reunify the children starting with J.J. in May of 2012, and the trial home visit I don't even think lasted two (2) months before he had to be removed again and returned to placement.  Um, these children have had non-stop inconsistency for several years now.  This is the first year that C.M. has gone to the same school with the same friends in his entire life.  And, um, I think its [sic] in the best interest of these children because they need permanency, they need stability so that they can focus on being kids.  And with [Mother] they never know what's gonna happen next.

16

Transcript at 206. Michael Harmeyer, the guardian ad litem, testified that it would be in the Children's best interest to be placed for adoption following the termination of parental rights. Harmeyer mentioned multiple reasons for his recommendation including Mother's: inability to successfully complete services, continuing instability on multiple fronts, thirty-percent attendance rate at the CAP program, fairly inconsistent involvement with the DBT Program, participation in Transitions, admitted alcohol abuse even during the CHINS case, probation violation and conviction for operating a vehicle while intoxicated, mental issues, threat of suicide in January 2013, and lack of employment. Harmeyer mentioned that J.J. had to be removed from Mother's care four separate times since 2008. Harmeyer also stated:

> I guess what this really all leads up to is the final recognition which is, um, after nearly two (2) years of services as we sit here today none of the four (4) children are currently placed, uh, with Mother and in fact they've been out of her care – with the exception of a short stint for J.J., been out of her care for twenty-two (22) months.

Id. at 237-238.

Based upon the evidence discussed above and in the record, we conclude that there is clear and convincing evidence to support the trial court's determination that termination of Mother's parental rights is in the Children's best interests. See, e.g., In re A.I., 825 N.E.2d 798, 811 (Ind. Ct. App. 2005) (testimony of court-appointed advocate and family case manager, coupled with evidence that conditions resulting in continued placement outside home will not be remedied, is sufficient to prove by clear and convincing evidence termination is in child's best interests), trans. denied.

CONCLUSION

This Court will reverse a termination of parental rights "only upon a showing of 'clear error'—that which leaves us with a definite and firm conviction that a mistake has been made." In re A.N.J., 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting Egly v. Blackford Cnty. Dep't of Pub. Welfare, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error here.

Affirmed.

VAIDIK, C.J., and NAJAM, J., concur.